**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
PINE BLUFF DIVISION**

SUN LIFE ASSURANCE COMPANY                                          PLAINTIFF
OF CANADA (U.S.), n/k/a DELAWARE
LIFE INSURANCE COMPANY

v.                                        No. 5:15CV00023 JLH

JAMES L. NELSON; SHANNON D. NELSON;
and JAMES W. NELSON                                               DEFENDANTS

JAMES L. NELSON                                             COUNTER-CLAIMANT

v.

SUN LIFE ASSURANCE COMPANY
OF CANADA (U.S.), n/k/a DELAWARE
LIFE INSURANCE COMPANY                                  COUNTER-DEFENDANT

## OPINION AND ORDER

On April 24, 2000, Sun Life issued to James L. Nelson an annuity contract in which he was

designated as the participant and the annuitant.  Document #1-1 at 4.  His wife, Nellie R. Nelson,

was designated as the beneficiary. *Id*.  The annuity commencement date was June 1, 2031.  *Id*.  On

or about February 8, 2011, James L. Nelson submitted forms to make Nellie R. Nelson a co-owner

and to change the designated beneficiary to his sons, Shannon D. Nelson and James Wendell Nelson.

Documents #1-3 and #1-4.  Based upon those changes, the contract specifications page of the

contract was changed to show that the "Owner" was James L. Nelson and Nellie R. Nelson, the

"Annuitant" was James L. Nelson, and the "Beneficiary" was "multiple beneficiaries on file."

Document #10-1 at 5.  On September 17, 2014, Nellie R. Nelson died.  Document #1-6.  Delaware

Life sent a form to Shannon D. Nelson and James W. Nelson for them to disclaim any rights under

the contract, but Shannon D. Nelson returned the form to Delaware Life stating that he declined to

disclaim the benefits under the contract.  Document #1-7.  James L. Nelson then notified Delaware

Life that he did not believe that the death benefit was payable and that he was electing to withdraw the full cash value of the contract.  Document #1-8.

In response to what it deemed to be competing claims, Delaware Life filed its complaint for interpleader in this action, asking to interplead the proceeds of the contract into the registry of the Court and to be discharged from all liability under the contract.  Delaware Life alleged that the contract provides a death benefit of $100,000 and the parties are diverse in citizenship,[1] invoking this Court's jurisdiction under 28 U.S.C. § 1335.  James L. Nelson answered and filed a counterclaim for the full surrender value of the contract plus pre-judgment interest, a 12% penalty, and reasonable attorneys' fees pursuant to Ark. Code Ann. § 23-79-208.  Shannon D. Nelson and James W. Nelson have separately filed answers in which they assert claims to the benefits under the contract.

After the issues were joined, James L. Nelson filed a motion to dismiss the interpleader complaint on the ground that the death benefit is not currently payable under the contract, so there are no funds to be interpled.  In turn, Delaware Life moved to dismiss the counterclaim on the grounds that it was and is faced with competing claims to the proceeds of the contract and therefore should not be subjected to a counterclaim.  James L. Nelson argues that Delaware Life has no right to initiate this interpleader action because Delaware Life created the controversy by declaring the death benefit payable even though James L. Nelson, an owner, is still alive.  Document #11 at 1 and 18 at 8.  He argues that the contract unambiguously lists him as the owner and the death benefit is only payable upon the death of the owner.  Document #11 at 4.  Accordingly, James L. Nelson

---

[1] According to the complaint, Delaware Life's principal place of business is in Massachusetts, James L. Nelson is a resident of Arkansas, and both of his sons are residents of California.

counterclaims that Delaware Life has breached the contract by not paying him the cash surrender value when demanded and also when it filed the interpleader action.  Document #18 at 6.  On the other hand, Delaware Life claims this is a "quintessential interpleader situation" because James L. Nelson claims there is no death benefit payable and the beneficiaries claim they are entitled to split the death benefit proceeds.  Document #15 at 3.  However, James L. Nelson claims he and the beneficiaries are not making claims on the same money.  He is claiming the cash surrender value and they are claiming the death benefit proceeds.  Document #18 at 7.  In short, Delaware Life contends that an interpleader is justified; James L. Nelson contends that it is not.

"Interpleader is a procedural device whereby a party holding money or property concededly belonging to another may join in a single suit two or more parties asserting mutually exclusive claims to the fund.  The stakeholder is thereby freed from the threat of multiple liability and/or [sic] vexation of multiple lawsuits." *Gaines v. Sunray Oil Co.*, 539 F.2d 1136, 1141 (8th Cir. 1976).  The interpleader statute, 28 U.S.C. § 1335, and Federal Rule of Civil Procedure 22 "are designed to protect stakeholders not only from double or plural liability but also from duality or plurality of suits, and both the statute and the rules are to be construed liberally." *Dakota Livestock Co. v. Keim*, 552 F.2d 1302, 1306 (8th Cir. 1977).  "[T]he stakeholder should not be compelled to run the risk of guessing which claimant may recover from the fund."  7 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 1704 (3d ed. 2014).  "[T]he normal rule is that interpleader protection does not extend to counterclaims that are not claims to the interpleaded funds." *Prudential Ins. Co. of America v. Hovis*, 553 F.3d 258, 264 (3d Cir. 2009).  "[W]here a stakeholder is allowed to bring an interpleader action, rather than choosing between adverse claimants, its failure to choose between the adverse claimants (rather than bringing an interpleader action) cannot itself be a breach of a legal duty." *Id.* at 265.  "Interpleader is justified only when the stakeholder has a

real and reasonable fear of double liability or conflicting claims." *Aaron v. Mahl*, 550 F.3d 659, 663 (7th Cir. 2008). Although the merits of the competing claims are determined only after a decision is made to allow the interpleader, an interpleader is not warranted unless the adverse claims "meet a 'minimal threshold level of substantiality.'" *Id.* (quoting *Indianapolis Colts v. Mayor and City Council of Baltimore*, 741 F.2d 954, 958 (7th Cir. 1984). Deciding whether the competing claims here meet this minimum threshold of substantiality necessarily requires interpretation of the contract.

"When a contract is unambiguous, its construction is a question of law for [the] court." *Artman v. Hoy*, 370 Ark. 131, 136, 257 S.W.3d 864, 869 (2007). Arkansas courts "apply three well-established principles of contract law." *Smith v. Arrington Oil & Gas, Inc.*, 664 F.3d 1208, 1212 (8th Cir. 2012) (quoting *First Nat'l Bank of Crossett v. Griffin*, 310 Ark. 164, 169, 832 S.W.2d 816, 819 (1992)). The first rule of interpreting a contract is to "ascertain and give effect to the intention of the parties." *Smith*, 664 F.3d at 1212 (quoting *Harris v. Stephens Prod. Co.,* 310 Ark. 67, 72, 832 S.W.2d 837, 840 (1992)). To determine the intention of the parties, Arkansas courts look to the contract as a whole and the circumstances surrounding its execution. *Griffin*, 310 Ark. at 170, 832 S.W.2d at 820. Second, in construing a contract, Arkansas courts "must consider the sense and meaning of the words used by the parties as they are taken and understood in their plain, ordinary meaning." *Id.* at 169, 832 S.W.3d at 819 (quoting *Farm Bureau Mut. Ins. Co. of Ark., Inc. v. Milburn*, 269 Ark. 384, 386, 601 S.W.2d 841, 842 (1980)). Third, "different clauses of a contract must be read together and the contract construed so that all of its parts harmonize, if that is at all possible." *Griffin*, 310 Ark. at 169-70, 832 S.W.2d at 819 (quoting *Cont'l Cas. Co. v. Davidson*, 250 Ark. 35, 41, 463 S.W.2d 652, 655 (1971)). "A construction that neutralizes any provision of a contract should never be adopted, if the contract can be construed to give effect to all provisions." *Tyson Foods, Inc. v. Archer*, 356 Ark. 136, 144, 147 S.W.3d 681, 686 (2004).

4

"When contracting parties express their intention in a written instrument in clear and unambiguous language, it is the court's duty to construe the writing in accordance with the plain meaning of the language employed." *Artman*, 370 Ark. at 136-37, 257 S.W.3d at 869. "The initial determination of the existence of ambiguity rests with the court and, if the writing contains a term which is ambiguous, parol evidence is admissible and the meaning of the ambiguous term becomes a question of fact for the factfinder." *Griffin*, 310 Ark. at 169, 832 S.W.2d at 819. Nonetheless, "[t]o arrive at the intention of the parties to a contract, courts may acquaint themselves with the persons and circumstances and place themselves in the same situation as the parties who made the contract." *Stokes v. Roberts*, 289 Ark. 319, 323, 711 S.W.2d 757, 759 (1986). "Language in a contract is ambiguous when there is doubt or uncertainty as to its meaning or it is fairly susceptible of two interpretations." *Denton v. Pennington*, 82 Ark. App. 179, 183, 119 S.W.3d 519, 521 (2003).

The basic provision of the contract provides:

> [The Company] will pay an annuity commencing on the Annuity Commencement Date, by applying the adjusted value of the Accumulation Account in accordance with the settlement provisions. If the Owner dies while the Contract is in effect and before the Annuity Commencement Date, the Company may pay a Death Benefit to the Beneficiary upon receipt of Due Proof of Death of the Owner. Under certain circumstances, if the Owner dies prior to the Annuity Commencement Date, a distribution is required by law. This Contract is the legal Contract.

Document #1-1 at 1. The term "annuitant" is defined as follows:

> The person or persons named on the Contract Specifications page on whose life the first annuity payment is to be made. If the Annuitant dies prior to the Annuity Commencement Date, the new Annuitant will be the Co-Annuitant, if any. If the Co-Annuitant dies or if no Co-Annuitant is named, the Owner becomes the Annuitant upon the Annuitant's death prior to the Annuity Commencement Date.

*Id*. at 6. The term "owner" is defined as follows:

> The person named in the Contract Specifications page who is entitled to exercise all rights and privileges of Ownership under the Contract. The Owner may designate

5

a trustee or custodian of a retirement plan . . . but the term Owner, as used herein, refers to the organization entering into the Contract.

*Id*. at 7.

The initial issue is whether the death of Nellie R. Nelson triggered payment of the death benefit. The relevant portion of the death benefit provision in the contract provides:

> If the Owner dies while this Contract is in effect and before the Annuity Commencement Date, upon receipt of Due Proof of Death, the Company may pay a Death Benefit to the Beneficiary in accordance with this Death Benefit provision. If the Owner is not a natural person, the Annuitant is considered the Owner for the purpose of this Death Benefit provision.

*Id*. at 14.

The first sentence of this provision contemplates that "the Owner" is one natural person, not a corporation or two natural persons. If the first sentence contemplated that there could be more than one owner whose death could trigger payment of the death benefit, it would say, "[i]f *an* owner dies" rather than "[i]f *the* Owner dies . . . ." When "the Owner" is a corporation or more than one natural person, according to the second sentence, death of "the Annuitant" triggers payment of the death benefit. Thus, when there are co-owners of the contract, the different owners may exercise ownership rights, but only one of them will be the annuitant whose death will trigger payment of the death benefit.

In this instance, the annuitant was James L. Nelson. Because Nellie R. Nelson was not the annuitant, arguably her death could not trigger the death benefit unless James L. Nelson predeceased her and she became the annuitant, which did not happen.

Delaware Life has argued that 26 U.S.C. § 72(s)(1)(B) provides to the contrary. That section of the statute provides, "[a] contract shall not be treated as an annuity contract for purposes of this title unless it provides that . . . if any holder of such contract dies before the annuity starting date,

6

the entire interest in such contract will be distributed within 5 years after the death of such holder."

Twenty-Six U.S.C. § 72 governs the conditions under which annuity payments under annuity

contracts are treated as gross income for income tax purposes.  *See* 26 U.S.C. § 72(a).  The statute

does not, however, purport to alter the terms of any annuity contract.

Delaware Life also cites a provision of the contract that appears in the section entitled

"Ownership Provisions."  That provision states:

> If an Owner under a Non-Qualified Contract dies prior to the Annuity
> Commencement Date, that Owner's Account must be distributed to the "designated
> Beneficiary" . . . either (1) as a lump sum within five years after the date of the death
> of the Owner, or (2) as an annuity over some period not greater than the life or
> expected life of the designated Beneficiary, with annuity payment beginning within
> one year after the date of the death of the Owner.

Document #1-1 at 20.  James L. Nelson argues that this provision does not apply with respect to the

death of Nellie R. Nelson because Nellie had no account to be distributed, because the distribution

for which this provision provides would not occur until both owners die, and because the annuity

contract at issue is not a "Non-Qualified Contract."

Starting with the last argument, the contract defines "Qualified Contract" as "[a] Contract

used in connection with a retirement plan which may receive favorable federal income tax treatment

under Sections 401, 403, 408 or 408A of the Code."  *Id.* at 7.  A "Non-Qualified Contract" is "[a]

Contract used in connection with a retirement plan which does not receive favorable income tax

treatment under Sections 401, 403, 408 or 408A of the Code."  *Id.*  James L. Nelson argues that the

contract was not used in connection with a retirement account, so it was neither a Qualified Contract

nor a Non-Qualified Contract.  When he completed the application, however, he selected "Non-

Qualified" as the type of plan for which he was applying.  Document #1-2 at 1.  Thus, at a minimum,

there is a fact issue as to whether the contract was a Non-Qualified contract.

With respect to James L. Nelson's other arguments, the term "Owner's Account" is not defined in the contract. The contract does provide for an "Accumulation Account," Document #1-1 at 9, which, as its name suggests, may accumulate value over time. *Id*. at 9-12. Arguably, the accumulation account is the account to which the annuity contract refers to as the "Owner's Account," because the owner has the right to request full or partial surrender of the Accumulation Account. *Id*. at 12. Nothing in the contract explains, however, how ownership of the accumulation account is allocated if more than one owner exists. James L. Nelson may believe that he was the sole owner of the Accumulation Account, but the contract does not say that. Because James L. Nelson changed the designations so that Nellie R. Nelson became a co-owner and the sons became beneficiaries, the contract does not unambiguously provide that he, James L. Nelson, was the sole owner of any cash value of the contract. Nor does the provision at issue specifically say that, when there is more than one owner, the distribution will not occur until after both have died.

Here, as noted, Shannon D. Nelson returned documents to Delaware Life claiming the death benefits under the contract, but James L. Nelson claimed that the death benefit was not payable and demanded the full cash value of the contract. Contrary to James L. Nelson's argument, the cash value and the death benefits under the contract are not independent of one another. If Delaware Life had paid the death benefit to Shannon D. Nelson and James W. Nelson, no cash value would remain; and if James L. Nelson withdraws the entire cash value of the contract, there will be no death benefit to be paid. Furthermore, even if the death of Nellie R. Nelson did not trigger payment of the death benefit, the provision calling for distribution of the account of "an Owner" upon that owner's death arguably applies – at least, the contract is ambiguous on that issue. So, Delaware Life had legitimate reason to believe that it was faced with competing claims when Shannon D. Nelson and James L. Nelson both made claims under the contract following the death of Nellie R. Nelson. These claims

meet the minimal threshold of substantiality required to warrant an interpleader.  Delaware Life is not required to "assume the responsibility of deciding disputed facts and controverted propositions of law." *Dennis v. Equitable Life Assur. Soc.*, 191 Ark. 825, 833, 88 S.W.2d 76, 80 (1935).  James L. Nelson's counterclaim is essentially an argument that the contract proceeds should go to him, which is not independent of the interpleader claim.  *Cf. Hovis*, 553 F.3d at 264-65.  Delaware Life did not breach the contract by withholding payment and filing an interpleader action to determine who is rightfully owed the contract proceeds.

The cases that Nelson cites to support his breach of contract counterclaim are distinguishable because the insurer that filed the interpleader action in those cases had no reasonable basis to believe there were competing claims in the funds.  No opposing interests were put forward.  In *Farm Bureau Mut. Ins. Co. of Ark., Inc. v. Guyer*, 2011 Ark. App. 710, 386 S.W.3d 682, 689-90, the Court found that the interpleader filed by an insurer unnecessarily delayed payment of proceeds by naming defendants who had no claim on the interpleaded funds and therefore the insurer was liable for statutory penalties.  In *Usable Life v. Fow*, 307 Ark. 379, 382-83, 820 S.W.2d 453, 455 (1991), the insurer never received written notice of a competing interest and was therefore liable for prejudgment interest, statutory penalty, and attorneys' fees resulting from the interpleader claim. *State Farm Bureau Cas. Ins. Co. v. Parsons*, 2015 Ark. App. 95, at 1-3, 2015 WL 711602, was decided on a procedural issue, i.e., that the circuit court had jurisdiction to set aside an interpleader order because a final judgment had not been entered.

For the reasons stated, Delaware Life Insurance Company is entitled to interplead the available benefits under the contract and is authorized to deposit them into the registry of the Court.

Delaware Life must deposit the full amount of the death benefit,[2] or the full surrender value of the contract, whichever is greater, into the registry of the Court.  When Delaware Life makes that deposit into the registry of the Court, it must file and serve an affidavit by its authorized representative stating the amount of the deposit and why that amount suffices under this Order.  Any party who contests whether Delaware Life's deposit complies with this Order may file an objection within fourteen days after the affidavit is filed and served.  If no objections are filed, or if the objections appear to be without merit, the Court will enter an Order dismissing Delaware Life from this action.  The counterclaim filed by James L. Nelson will be dismissed.

IT IS SO ORDERED this 28th day of May, 2015.

_____
J. LEON HOLMES
UNITED STATES DISTRICT JUDGE

---

[2] Delaware Life's complaint requested that it be permitted to tender the total sum of the death benefit into the registry of the Court, Document #1 at 3, so that request is granted, provided the death benefit is greater than the full surrender value of the contract.